## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Artisan & Truckers Cas. Co.,

 *Plaintiff,*

v.

Dollar Tree Stores, Inc. *et al.*,

 *Defendant*

No. 20 C 290

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

In this diversity action, Plaintiff Artisan & Truckers Casualty Company ("Artisan") seeks a declaratory judgment settling its rights and obligations under an insurance policy it issued to Defendant Ljupka Logistics, Inc. ("Ljupka"), its insured. Before the Court is Artisan's motion for summary judgment. [Dkt. No. 76]. For the reasons set forth below, the Court grants the motion in full.

## I. Background

The Court draws its facts primarily from the parties' Local Rule 56.1 statements and responses. [78], [92], [93], [94], [95]. However, where the Court feels that the parties' filings leave out relevant information, it pulls additional material from the record. *See* FED. R. CIV. P. 56(c)(3) (noting that "courts need consider only the cited materials, but . . . may consider other materials in the record" as well). The Court's decision to cite as undisputed a statement of fact that a party has attempted to dispute reflects its determination that the evidence cited by the disputing party fails to show a genuine dispute as to that fact.

### A.    The Dollar Tree Delivery and the McCoy Accident

Ljupka Logistics, Inc., is a motor carrier of property for hire, [Dkt. No. 92, ¶ 2], meaning it "transports, for compensation, the goods or property" of others. 49 U.S.C. § 13102(14); 49 C.F.R. § 387.5. On August 1, 2018, Ljupka executed a Broker/Carrier Agreement with Defendant U.S. Xpress, Inc. ("USX"). [Dkt. No. 92-1]. In its capacity as a broker, USX facilitates the transportation of goods by matching carriers, like Ljupka, with shipments in need of delivery. By entering into the agreement, Ljupka could take on work brokered by USX on behalf of its customers.

In late August of 2018, one of those customers—Defendant Dollar Tree Stores, Inc. ("Dollar Tree")—needed freight delivered to stores in Des Plaines, Mount Prospect, and Villa Park, Illinois. *See* [Dkt. No. 78-2, 119–121, Exhibit 7] (Load Tender and Rate Agreement Sheet). USX brokered the shipment to Ljupka which, in apparent violation of its contract with USX, assigned the load to another trucking company, Defendant GLS Group LLC ("GLS"). [Dkt. No. 92, ¶ 36]. Ljupka's owner, Frosina Gjorgjevska, is married to GLS's owner and sole member, Zoran Gjorgevski. [Dkt. No. 78-1, Frosina Dep. Tr. 8:13–17].[1]

GLS dispatched the load to Elliott McCoy, who began driving for GLS on October 30, 2017. [Dkt. No. 78-2, 205, Exhibit 15]; [Dkt. No. 78-2, Zoran Dep. Tr. 59:10–15]. In the early hours of August 29, McCoy drove Zoran's tractor—a 2007 Volvo—to a warehouse in Joliet, Illinois, to pick up the shipment. [Dkt. No. 78-3, McCoy Dep. Tr. 25:2–9]; [Dkt. No. 92, ¶¶ 14]. The warehouse was managed by

---

[1]    Both companies operate out of the couple's home in Countryside, Illinois. [Dkt. No. 78-1, Frosina Dep. Tr. at 13:4–20]; [Dkt. No. 78-2, Zoran Dep. Tr. 11:8–15].

Defendant Dollar Tree Distribution, Inc. ("Dollar Distribution"), in conjunction with Defendant Securitas Security Services USA, Inc. ("Securitas"), which apparently manned the facility's security gate. [Dkt. No. 92, ¶¶ 34, 43, 46]; [Dkt. 52-1, ¶¶ 12, 14].

The Dollar Tree job was what is known in the trucking industry as a "drop and hook" operation—the freight Ljupka (and, by further assignment, GLS) was responsible for transporting was pre-loaded onto a trailer prior to McCoy's arrival. [Dkt. No. 78-2, Zoran Dep. Tr. 30:17–31:5]; [Dkt. No. 92, ¶ 46]. That trailer, a 2016 Wabash, was supplied by USX, which sub-leased it from another company. [*Id.* at ¶ 22]. There is some dispute whether McCoy was able simply to hook up the trailer to his tractor and hit the road or whether McCoy was responsible for installing load locks and storing the conveyer system[2] used to unload the shipment. [Dkt. No. 92-2, McCoy Dep. Tr. (state case) 39–45]; [Dkt. No. 92, ¶ 48]. Although this fact is of unquestionable significance to the merits of the underlying state case, it is immaterial to Artisan's motion.

McCoy was responsible for delivering the freight to three Dollar Tree stores, all located in Illinois. McCoy arrived at his first destination—Dollar Store #3601 in Des Plaines, Illinois—a few hours after leaving the Dollar Distribution facility. [Dkt. No. 92, ¶ 43]; [Dkt. No. 78-3, McCoy Dep. Tr. 41:21–42:3]. Upon arrival, a Dollar Tree manager opened the trailer's rear doors. [*Id.* at ¶ 48]; [Dkt. No. 78-3, McCoy Dep. Tr.

---

[2]    The conveyer system's individual components are sometimes referred to as "rollers" and sometimes as "conveyer belts." *See* [Dkt. No. 92-2, McCoy Dep. Tr. (state case) 39:12–22]. A photograph of the conveyer system can be viewed at [Dkt. No. 78-2, 123, Exhibit 9].

9:4–17].[3] When the doors were opened, boxes and the conveyer system stored in the back allegedly fell out of the trailer and onto McCoy. McCoy claims that he was struck with such force that he was "thrown to the ground" and "knocked unconscious." [Dkt. No. 53-1, ¶ 15]. McCoy was taken by ambulance to Lutheran General Hospital for treatment, [Dkt. No. 78-2, 126, Exhibit 10], and claims to suffer from long-term health problems as a result of the accident. [Dkt. No. 53-1, ¶ 18].

### B.  The McCoy Suit

On July 17, 2019, McCoy filed a negligence suit against Dollar Tree and USX in Cook County Circuit Court.[4] On September 11, Dollar Tree and USX removed the case to federal court on the basis of diversity jurisdiction. The case was remanded after McCoy filed his second amended complaint, which asserted additional negligence claims against Dollar Distribution, Ljupka, and GLS. [Dkt. No. 35-1]. The addition of Ljupka and GLS—both Illinois citizens like McCoy[5]—destroyed diversity.

---

[3]      In its response to Plaintiff's statement of undisputed facts, USX did not attempt to dispute Plaintiff's assertion that "the trailer doors were opened by a Dollar representative . . . ." [Dkt. No. 92, ¶48]. This appears to be inconsistent with the allegations of McCoy's second amended complaint in the underlying state suit. [Dkt. No. 53-1, ¶ 14]. Precisely who opened the trailer's rear doors is not material to the resolution of Plaintiff's motion, so the Court mentions this discrepancy no further.

[4]      Although McCoy's initial complaint is not in the record, a copy—of which the Court takes judicial notice—can be found at *McCoy v. Dollar Tree Stores, Inc.*, 1:19-cv-06104 (N.D. Ill., Eastern Div.), Docket Entry 1, Exhibit A. *See* FED. R. EVID. 201(b); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996) ("Determinations to be judicially noticed include 'proceeding[s] in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.'" (quoting *Philips Medical Sys. Int'l v. Bruetman*, 982 F.2d 211, 215 n.2 (7th Cir. 1992)).

[5]      The Court notes that Plaintiff's complaint in the instant case does not properly allege the citizenship of GLS Group LLC. Because GLS is an LLC, Plaintiff should have specifically identified each member and its citizenship. Instead, Plaintiff alleged generally that "Defendant GLS Group LLC is an Illinois limited liability company and its members are

On remand, McCoy amended the complaint a third time. [Dkt. No. 53-1]. That complaint—which remains the operative complaint below—added an additional negligence claim against Securitas, which allegedly inspected the contents of the trailer before McCoy left the Dollar Distribution facility. [*Id.* at p. 48, ¶ 14]. On top of that, McCoy's wife joined as a plaintiff and asserted loss of consortium claims against each Defendant.

### C. The Ljupka Policy and the Post-Accident Amendment

The McCoy lawsuit is ongoing. This declaratory judgment action arises out of an insurance policy Artisan issued to Ljupka for the period November 14, 2017, to November 14, 2018. *See* [Dkt. No. 53-5]. That policy was in place at the time of the McCoy accident. Artisan seeks to clarify two things: (1) whether, by virtue of that policy, it has a duty to defend Lujpka, or any other Defendant, against McCoy's claims; and (2) whether it bears, separate and apart from any duty to defend, an obligation to indemnify any Defendant for liability they might ultimately be found to have incurred for McCoy's injuries.

The policy is divided into two principal parts—one covering liability to others (Part I) and one covering damage to insured vehicles (Part II). [*Id.* at 6]. Because the McCoy accident involved personal injury, not damage to either the 2007 Volvo tractor or 2016 Wabash trailer, Part I applies. That part, in relevant part, provides the following:

---

citizens and residents of Illinois and this District." [Dkt. No. 53, ¶ 6]. Thankfully, the record clears things up such that no corrective action is necessary. In his deposition, Zoran Gjorgjievski stated, under oath, that "[i]n 2018 and up until" the deposition, he has "been the only manager" and "only member" of GLS Group. [Dkt. No. 78-2, Zoran Dep. Tr. 10:15–11:7].

> Subject to the Limits of Liability, if you pay the premium for liability coverage for the insured auto involved, we will pay damages other than punitive or exemplary damages for bodily injury, property damage, and covered pollution cost or expense, for which an insured becomes legally responsible because of an accident *arising out of the ownership, maintenance, or use of that insured auto*. However, we will only pay for the covered pollution cost or expense if the same accident also caused bodily injury or property damage to which this insurance applies.
>
> We will settle or defend, at our option, any claim or lawsuit for damages covered by this Part I. We have no duty to settle or defend any lawsuit, or make any additional payments, after the Limit of Liability for this coverage has been exhausted by payment of judgments or settlements.

[Dkt. No. 53-5, 12] (emphasis added).

As the policy makes clear, coverage extends only to liability arising out of the use of an "insured auto." That phrase is a term of art, defined by the policy to encompass four types of vehicles. [*Id.* at 8].

*First*, a vehicle is an "insured auto" if it is "shown on the [policy's] declarations page"—"the document prepared by [Artisan] listing [the insured's] policy information," including "the specifically described autos covered by [the] policy, and the types of coverage for each specifically described auto." [*Id.* at 8].

*Second*, a vehicle is an "insured auto" if it qualifies as an "additional auto." [*Id.*]. An auto qualifies as an additional auto if (1) the insured "acquire[d] the auto during the policy period shown on the declarations page;" (2) Artisan "insure[s] all autos owned by" the insured "that are used in [its] business;" (3) "no other insurance policy provides coverage for that auto; and" (4) the insured informs Artisan "within the 30 day period after" acquisition of its intent to cover the vehicle. [*Id.*]

*Third*, a vehicle is an "insured auto" if it qualifies as a "replacement auto." An

auto qualifies as a replacement auto if (1) the insured "acquire[s] the auto during the policy period shown on the declarations page;" (2) that "auto . . . replaces one specifically described on the declarations page due to termination of [the insured's] ownership of the replaced auto or due to mechanical breakdown of, deterioration of, or loss to the replaced auto that renders it permanently inoperable; and" (3) "no other insurance policy provides coverage for that auto." [*Id.* at 9].

*Finally*, a vehicle is an "insured auto" if it qualifies as a "temporary substitute auto." [*Id.* at 13]. An auto is a temporary substitute auto if it is an auto that the insured does "not own while used with the permission of its owner as a temporary substitute for an insured auto that has been withdrawn from normal use due to breakdown, repair, servicing, loss, or destruction." [*Id.* at 11, 13]. The policy defines loss somewhat circularly as any "sudden, direct and accidental loss or damage." [*Id.* at 9].

Artisan argues that because neither the 2007 Volvo tractor nor the 2016 Wabash trailer involved in the McCoy accident is an "insured auto" under any of these four definitions, it has no duty to defend or indemnify any Defendant under Part I (or, indeed, under any part) of the Ljupka policy. [Dkt. No. 77, 1–3]. Resolution of this issue is complicated by two factual wrinkles: the relatively murky ownership-status of the Volvo tractor involved in the accident and the amendment of the Ljupka policy declaration, shortly after the McCoy accident, to cover the Volvo.

As for the Volvo's ownership, as stated above, the tractor was formally owned by Zoran, not GLS. Beginning on December 16, 2017, however, GLS leased Zoran's

Volvo to Ljupka through an Owner/Operator Agreement. [Dkt. No. 78-2, 199–204, Exhibit 14]. Pursuant to that contract, GLS agreed that Ljupka would—for the duration of the lease—"have exclusive possession, control, and use of the equipment"—i.e., the Volvo—as well as "assume complete responsibility for [its] operation . . . ." [*Id.* at 199].

In spite of the apparent cession to Ljupka of total dominion over the Volvo, there is no indication that McCoy stopped using it to carry freight for GLS. Indeed, although the lease remained in place at the time of the McCoy accident, [Dkt. No. 78-1, Frosina Dep. Tr. 12:3–9], there is no suggestion that McCoy's use of the Volvo on GLS's behalf was improper or unusual. According to Zoran, it was understood that "GLS was to provide the driver when the 2007 Volvo was operated in Ljupka's business." [Dkt. No. 78-2, Zoran Dep. Tr. 58:4–18]. From this, the Court can infer that Ljupka and GLS's actual course of performance under the agreement relaxed the apparently absolute conferral of possession on Ljupka in favor of something more akin to an agreement to share the vehicle (along with McCoy's services).

As for the policy amendment, mere hours after the McCoy incident, Zoran called Progressive to add the 2007 Volvo to the policy declaration. [Dkt. No. 92, ¶ 25–26]. The record does not clarify the relationship between Progressive and Artisan and does not explain how Zoran, who neither owned nor worked for Ljupka, had the authority to amend the policy. Nevertheless, he managed to do so. Importantly, however, Zoran did not notify Progressive that the 2007 Volvo had, just hours before, been involved in the McCoy accident. [*Id.* at ¶ 29].

8

## II.  Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is material if its determination by the trier of fact "might affect the outcome of the suit under the governing law . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute with respect to such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

A court's "function" at this stage "is not . . . to weigh the evidence and determine the truth of the matter," but rather to determine "whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented."  *Id.* at 249, 252.  In conducting this inquiry, courts must "view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  *Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th Cir. 2022).

## III.  Analysis

To prevail on its motion for summary judgment, Plaintiff must establish that no reasonable jury could find that it has a duty to defend or indemnify the defendants to the McCoy lawsuit under the Ljupka policy, its endorsements, or any other source of law raised by Defendants in defense. Given the complexity of the Lujpka policy, which spans more than 100 pages and includes several endorsements, this is no simple matter.

Artisan's complaint reflects this difficulty, attacking—in a relatively complex

series of seven counts—every possible basis for insurer liability. Mercifully, the procedural history of this case has narrowed the focus of the lawsuit considerably from that initial breadth. Of the defendants who have appeared, only USX opposes the entry of summary judgment. USX, for its part, does not oppose the entry of summary judgment on Count VII, which seeks to establish the non-applicability of Lujpka's commercial general liability endorsement. *See* [Dkt. No. 53-5, 68–90] (CGL endorsement); [Dkt. No. 83, 11] ("USX does not dispute Artisan's relief as sought in Count VII.").

Of the remaining counts, Artisan asserts counts III, IV, V, and VI only in the alternative to counts I and II. [Dkt. No. 76, 1]; [Dkt. No. 77, 1]. Count I sets out to establish that the Lujpka policy's primary coverage provisions (i.e., Part I of the policy discussed above) do not apply to the McCoy incident because neither the tractor nor the trailer involved was an "insured auto" within the meaning of the policy. Count II then seeks to establish the non-applicability of an endorsement mandated by the Federal Motor Carrier Safety Administration—Form MCS-90—that could potentially provide a basis for indemnification even if none of the vehicles involved in the McCoy incident were insured under the Lujpka policy.

In opposing summary judgment, USX raises a third possible basis for insurer liability that the Court must also address, a counterpart to MCS-90 mandated by Illinois law. [Dkt. No. 83, 7–9]; 625 ILCS 5/18c-4903. USX appears to recognize that should the Court reject this argument, entry of summary judgment on counts I and II is sufficient to warrant granting the declaratory relief Plaintiff seeks. Because the

Court ultimately concludes that Plaintiff is entitled to summary judgment on all three of these issues, it will grant Plaintiff's motion for summary judgment without separately considering Counts III, IV, V, and VI.

### A. Lujpka Policy

The first question the Court must decide is whether Plaintiff has shown that no genuine dispute of fact exists that the 2007 Volvo and 2016 Wabash trailer involved in the McCoy accident are not covered by Part I of the Lujpka policy.

As the Court laid out above, the policy provides coverage only for damages "arising out of the ownership, maintenance or use of [an] insured auto," [Dkt. No. 53-5, 12], and the policy's definition of "insured auto" encompasses four kinds of vehicles: (1) those listed on the policy declaration; (2) additional autos; (3) replacement autos; and (4) temporary substitute autos.

USX does not dispute that the trailer involved in the McCoy incident is not covered under any of these four alternatives. That trailer—the 2016 Wabash—was sub-leased by USX from U.S. Xpress Leasing, Inc., which, in turn, leased the trailer from its owner, Milestone Trailer Leasing, LLC. [Dkt. No. 92, ¶ 22]. At no time, either before the accident or after, was the trailer listed on the Lupjka declaration, and there is no suggestion that it was ever acquired by Lujpka or used to replace the 2003 Wabash trailer initially listed on the Artisan declarations page. For these reasons, there is no conceivable basis upon which the 2016 Wabash could constitute an insured auto under the Lujpka policy.

That just leaves the 2007 Volvo. In opposing Artisan's motion for summary

judgment, USX does not argue that that tractor is covered as an additional, replacement, or temporary substitute auto. [Dkt. No. 83, 3–4]. Instead, USX's sole argument turns on the post-accident amendment of the Lujpka declarations page to specifically cover the Volvo. USX's argument on this score is simple—the policy, as amended, lists an effective date of August 29, 2018, and because that date does not "reflect [a] specific time of day the change is effective," it is at least a genuinely disputed issue of fact whether the policy amendment was effective at the time of the McCoy accident. [*Id.*]

Importantly, USX does *not* dispute that the amendment was executed by Zoran after the McCoy accident had already taken place, with full knowledge of that fact, and without bringing the accident to Progressive's attention. [Dkt. No. 92, ¶¶ 23–28]. Indeed, Zoran admitted all of this at his deposition. [Dkt. No. 78-2, Zoran Dep. Tr. 52:9–54:14]. USX's argument, rather, is that the contract itself does not answer—at least as a matter of law justifying the entry of summary judgment—the question whether the amendment was intended to apply retroactively to events occurring on August 29, 2018, but prior to execution of the amendment.

This argument is easily dispatched with. The amended Lujpka declarations page states, unambiguously, that "changes shown above will *not* be effective prior to the *time the changes were requested.*" [Dkt. No. 78-2, 195, Exhibit 13] (emphasis added). The "changes" to which this provision refers include, *inter alia*, changes to "[t]he auto coverage schedule"—in other words, the addition of the 2007 Volvo. [*Id.*] In opposing summary judgment, USX makes no effort to address this express

disallowance of retroactive coverage. Instead, it examines the phrase "effective August 29, 2018" in isolation, deems it at least ambiguous as to retroactivity, and adverts to the Illinois doctrine that ambiguous "insurance clause[s] . . . must be construed in favor of the insured." *Grzeszczak v. Ill. Farmers Ins. Co.*, 168 Ill. 2d 216, 223, 659 N.E.2d 952, 956 (Ill. 1995).

When severed from its neighboring provisions, the phrase "effective August 29, 2018" may well be ambiguous. But insurance policies, no less than other contracts, "must be construed as a whole, viewing each provision in light of the other provisions." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (Ill. 2011); *Goldstein v. Grinnell Select Ins. Co.*, 405 Ill. Dec. 518, 521–22, 58 N.E.3d 779, 782–83 (Ill. App. Ct. 2016). The ambiguity necessary to trigger the tiebreaking principle of construal against the insurer exists only when—"constr[uing] [the] insurance policy as a whole" and "giving effect to each provision where possible"—a term remains "susceptible to more than one reasonable interpretation." *Sanders v. Ill. Union Ins. Co.*, 441 Ill. Dec. 542, 546, 157 N.E.3d 463, 467 (Ill. 2019).

USX's preferred interpretation of "effective August 29, 2018," would fly in the face of the policy's explicit reservation that the changes listed on the declaration would "not be effective prior to the time the changes were requested." Read as a whole, there is absolutely no indication in the contract that "effective August 29, 2018," was meant, *sub silentio*, to override its neighbor. Accordingly, the Court finds that "effective August 29, 2018," is not reasonably susceptible of USX's interpretation and holds, as a matter of law, that the addition of the 2007 Volvo was not effective at

13

the time of the McCoy accident.

Because the Court rests its decision on basic principles of contract interpretation, it does not reach Plaintiff's additional argument that coverage is foreclosed by the known loss doctrine, [Dkt. No. 85, 3–4], though in all likelihood that line of inquiry would lead to the same conclusion. As the Illinois Supreme Court stated in *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 103–04, 607 N.E.2d 1204, 1210 (Ill. 1992), "[b]y its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur," and an insurer cannot be duped into defending or indemnifying "the insured with respect to" a loss known "*ab initio*, unless the parties intended the known loss to be covered." (emphasis original).

Because the Volvo was not scheduled at the time of the McCoy accident, it is only covered if it qualifies as an additional, replacement, or temporary substitute auto. USX does not argue that it does, nor could it. At the time of the McCoy accident, the 2007 Volvo was covered by a separate insurance policy, a fact which precludes coverage as an additional or replacement auto. [Dkt. No. 92, ¶ 30]. And there is no indication that the Volvo was "used with the permission of its owner"—Zoran—as a temporary substitute for an insured auto that has been withdrawn from normal use due to breakdown, repair, servicing, loss, or destruction." [Dkt. No. 53-5, 11, 13]. Indeed, Ljupka leased the vehicle from GLS long before the 2006 Freightliner originally scheduled on the declarations page was taken by its owner, Gregory Bea, to a new company. [Dkt. No. 92, ¶¶ 6–8, 17]; [Dkt. No. 78-2, Zoran Dep. 27:1–20].

For these reasons, neither the 2007 Volvo tractor nor the 2016 Wabash trailer

14

involved in the McCoy accident was an "insured auto" under Part I of the Lujpka policy at the time of the accident. Because that is the only part of the Lujpka policy that could potentially apply to the McCoy accident, Plaintiff has no duty to defend the lawsuit below nor any obligation to indemnify the Defendants arising from the terms of the policy itself.

### B.    MCS-90 Endorsement

That is not the end of the matter, however. The Ljupka policy is modified by a number of riders—known in the insurance industry as "endorsements"—that impose obligations where the policy otherwise would not. *See* [Dkt. No. 53-5, 1] (listing endorsements). Many of these endorsements are required by state or federal law in the furtherance of ]public policy. For present purposes, only one of the Ljupka endorsements is material.

That endorsement, known as Form MCS-90, requires Artisan to indemnify Ljupka for up to $750,000 in damages

> resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.

[Dkt. No. 53-5, 115–116].

The MCS-90 endorsement "creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured." *Canal Ins. Co. v. Distr. Servs., Inc.*, 320 F.3d 488, 490 (4th Cir. 2003). By its terms, however, MCS-90 applies only to

15

"motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 . . . ."

As the Seventh Circuit recently recognized in *Prime Ins. Co. v. Wright*, "these statutes have been repealed, and the laws governing truck transportation have been recodified since the Endorsement's language was specified by a federal regulation . . . ." 57 F.4th 597, 599 (7th Cir. 2023). The MCS-90 endorsement's metes and bounds are now defined primarily by 49 U.S.C. § 31139(b)(1) and that provision's implementing regulations. 49 U.S.C. § 31139(b)(1) requires the Secretary of Transportation to

> prescribe regulations to require minimum levels of financial responsibility sufficient to satisfy liability amounts established by the Secretary covering public liability, property damage, and environmental restoration for the transportation of property by motor carrier or motor private carrier (as such terms are defined in section 13012 of [Title 49]) in the United States between a place in a State and –
>
> > (A) a place in another State;
> > (B) another place in the same State through a place outside of that State; or
> > (C) a place outside the United States.

This statutory provision is implemented by 49 C.F.R. §§ 387.1 *et seq.* 49 C.F.R. § 387.9 obligates for-hire motor carriers of nonhazardous property to carry $750,000 in "financial responsibility." Section 387.7 permits a carrier to satisfy this requirement in several ways, including the addition of the MCS-90 endorsement to its insurance policy. 49 C.F.R. § 387.7(d)(1). The regulations make clear, however, that the financial responsibility requirement is applicable only to "motor carriers of property operating motor vehicles in interstate, foreign, or interstate commerce." 49

16

C.F.R. § 387.1; *see also id.* at § 387.3 ("This subpart applies to for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce").

Plaintiff argues that Lujpka's MCS-90 endorsement does not apply because McCoy was injured while driving a route entirely within the State of Illinois. [Dkt. No. 77, 3–4]. As a quick reminder, McCoy's itinerary for the Dollar Tree load—had he completed it—had him driving from the Joliet warehouse to three Illinois towns—Des Plaines, Mount Prospect, and Villa Park. [Dkt. No. 78-2, 119–121, Exhibit 7]; [Dkt. No. 92, ¶ 44]. There is no suggestion that driving this route would have required him to cross state lines. Plaintiff argues that these facts foreclose any possible finding that the vehicle was being operated "in interstate commerce" at the time of the accident. [Dkt. No. 77, 4].

As USX correctly points out, there is a "a split in authority whether the MCS-90" can apply to a purely intrastate accident in circumstances like these. [Dkt. No. 83, 5]. Some courts follow "the 'trip specific' approach" adopted by the Fifth Circuit in *Canal Insurance Co. v. Coleman*, 625 F.3d 244 (5th Cir. 2010), under which the MCS-90 endorsement "applies only when a truck is loaded with freight and moving from one state to another at the moment of the collision." *Wright*, 57 F.4th at 598. Others have followed "the 'fixed intent' approach" adopted by the Eighth Circuit in *Century Indemnity Co. v. Carlson*, 133 F.3d 591 (8th Cir. 1998), under which the endorsement "applies when the driver has a fixed intent to transport freight across state lines in the near future." *Id.* Yet others apply "a 'totality of the circumstances' approach." *Id.*

In *Wright*, the Seventh Circuit disavowed all of these approaches for one rooted

more firmly in the text of 49 U.S.C. § 31139(b)(1). Interpreting 49 U.S.C. § 31139(b)(1) in light of 49 U.S.C. §§ 1302(23) and 13501, which the former incorporates by reference, the Court held in *Wright* that the MCS-90 endorsement applies only when an accident occurs "during an interstate journey to deliver freight" or during the taking of an ancillary step related to such a journey (i.e., "arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of . . . property"). *Id.* at 599–600. In so holding, the Court made clear that the relevant unit of analysis in ascertaining whether a carrier is operating in interstate or foreign commerce is the itinerary of the carrier's route at the time of the accident, *not*, more narrowly, the specific portion of that itinerary on which the accident took place or, more broadly, the nature of the carrier's business as a whole.

Defendant's opposition brief—filed before *Wright* was decided—encourages the Court to look broadly to the nature of the relationship between McCoy and GLS as well as to the Broker/Carrier Agreement entered into between USX and Ljupka. USX maintains that given the "evidence that McCoy and GLS regularly engaged in interstate commerce" as well as the fact that "[t]he Broker-Carrier Agreement specifically provided for the transportation of interstate and foreign commerce," it is at least in dispute whether the McCoy accident took place in interstate commerce, such that the MCS-90 endorsement would apply. [Dkt. No. 83, 6].

Such an approach is foreclosed by *Wright*, which asks courts in this Circuit to look to the discrete "journey" underway when the accident occurred. 57 F.4th at 600.

Here, it is undisputed that "that McCoy's trucking activities on the date of the Incident were within Illinois . . . ." [Dkt. No. 83, 6]. This fact dooms Defendant's argument as a matter of law. Because the McCoy accident took place on a route that never would have taken him outside of Illinois, he was not "operating . . . in interstate or foreign commerce," and the MCS-90 endorsement does not apply. The Court will therefore enter summary judgment in Plaintiff's favor on this issue as well.

### C.    Illinois Proof of Insurance

This just leaves potential coverage under 625 ILCS 5/18c-4903, an issue USX raised in its opposition brief that could provide a ground for indemnification in spite of the Court's holdings on counts I and II of Plaintiff's complaint. Illinois, it turns out, imposes a requirement on motor carriers of property that bears many similarities to 49 U.S.C. § 31139(b)(1)'s minimum financial responsibility requirements. It does so through the Illinois Commerce Commission ("the Commission"), which exercises jurisdiction over "all motor carriers of property operating within the State of Illinois." 625 ILCS 5/18c-4101.

It is generally unlawful for an intrastate motor carrier to operate in Illinois without a license from the Commission. 625 ILCS 5/18c-4104(1)(a). To secure a license, a carrier must file with the Commission—through its insurer or surety—proof of "appropriate insurance or surety coverage." *Nationwide Freight Sys., Inc. v. Ill. Commerce Comm'n*, 784 F.3d 367, 368 (7th Cir. 2015); 625 ILCS 5/18c-4901. Submission of proof of insurance or surety coverage impliedly amends the insurance policy or surety contract in two ways. *First*, by operation of law it extends the duration

of the policy or contract indefinitely "until notice of cancellation is filed in accordance with Commission regulations." 625 ILCS 5/18c-4903. *Second*, and most importantly for present purposes, it expands the scope of the policy or contract to cover "all motor vehicles operated by or under authority of the carrier . . . , whether or not such vehicles have been reported to the insurance, surety, or other company." *Id.*

Proof of insurance is filed by the insurer, not the carrier. 92 Ill. Admin. Code § 1425.20; Illinois Commerce Commission, *Insurance Requirements for Public Carrier Certificate*, https://www.icc.illinois.gov/forms/. If a carrier's insurer files proof of insurance with the ICC, the insurance policy is deemed—not unlike the expansion effected by the MCS-90 endorsement—to cover vehicles that are not specifically covered by the policy. As with MCS-90, an insurer's liability under 625 ILCS 5/18c-4903 is limited to the minimum insurance levels required by the Commission. 625 ILCS 5/18c-4902.

USX argues that, even if the 2007 Volvo tractor and 2016 Wabash trailer are not covered by the Ljupka policy or MCS-90, "there are genuine questions of material fact as to whether the Artisan policy will be found to apply for the minimum limits required by Illinois," *i.e.*, whether the Artisan policy is impliedly amended by 625 ILCS 5/18c-4902 to provide indemnification for the McCoy accident. [Dkt. No. 83, 8].

As Plaintiff emphasizes in reply, the implied amendments imposed by 625 ILCS 5/18c-4902 take effect only upon the "[f]iling [of] proof of insurance with the Commission." 625 ILCS 5/18c-4903. Only then is the insurer deemed to have "accept[ed] . . . [the] implied term[s] . . . ." *Id.*; *cf.* 92 Ill. Admin. Code § 1425.20(b)

("The filing of such proof shall constitute acceptance of the minimum terms required by this Part or by the statute and shall bind *the insurance company* thereto") (emphasis added). This poses serious problems for Defendant. It is undisputed that at the time of the accident, Ljupka was operating without a license from the Commission, a deficiency not remedied until December 13, 2018. [Dkt. No. 95, ¶ 76].

Because Progressive (presumably on behalf of Artisan, although the record, again, doesn't clarify the relationship between the two) did not file proof of insurance with the Commission until December 1, 2018, [*Id.*, ¶ 75], it had not "accept[ed]" the implied amendments imposed by 625 ILCS 5/18c-4902 at the time of the McCoy accident in August 2018. The Court agrees with Plaintiff that, for this reason, "the implied term of insurance was not triggered in this case." [Dkt. No. 85, 6]. The Court also agrees that, in circumstances like these, an insurer cannot be punished, through contract reformation, for the failure of its insured to comply with state law, [*Id.* at 6], particularly in light of the fact that Illinois law imposes both criminal penalties and civil sanctions for operating without a license from the ICC. 625 ILCS 5/18c-1704; *see also Nationwide Freight Systems*, 784 F.3d at 369.

For these reasons, the Ljupka policy was not impliedly amended by 625 ILCS 5/18c-4903 to provide coverage for the unscheduled vehicles involved in the McCoy accident.

## IV.     Conclusion

The Court's resolution of these issues renders unnecessary any examination of Counts III, IV, V, and VI, each of which assumes that the 2007 Volvo tractor is covered by the Lujpka policy. Because Plaintiff has shown that there is no genuine dispute of fact that the vehicles involved in the McCoy accident are *not* covered by (1) the Lupjka policy; (2) any of the Lujpka policy's endorsements; or (3) Illinois law, the Court grants its motion for summary judgment. [Dkt. No. 76].

Plaintiff's counsel is directed to submit a proposed declaratory judgment to the Court's proposed order box. A declaratory judgment will follow and the case will be closed.


Enter: 20-c-290

Date: May 23, 2023